IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GARY BANKS,                              )
                                         )  Civil Action No.  08 - 4E
                       Plaintiff,        )
                                         )  District Judge David S. Cercone
              v.                         )  Magistrate Judge Lisa Pupo Lenihan
                                         )  Doc. No. 63
LT. MARK MOZINGO, *et al.*,              )
                                         )
                       Defendant.        )
                                         )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

I.        RECOMMENDATION

It is respectfully recommended that Defendants' Motion for Summary Judgment (doc. no. 63) be granted.

II.       REPORT

Plaintiff, Gary Banks, commenced this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983.  He has been determined by the Pennsylvania Department of Corrections (DOC) to be among the most difficult of prisoners, resulting in his placement in the Long Term Segregation Unit (LTSU). which was used to house the most violent, disruptive and defiant prisoners within the system.[1]  He was placed in the LTSU prior to the spring of 2001, shortly after it was created at the State Correctional Institute at Pittsburgh, and remained there[2] until it was discontinued in February of 2007 and thereafter became the Special Management Unit (SMU) .

---

1.  *See, e.g.*, [Ronald] Banks v. Beard, 399 F.3d 134, 136-141 (3d Cir. 2005) (describing LTSU), *rev'd*, 548 U.S. 521 (2006). Commitment to the LTSU is open-ended and subject to the discretion of prison officials.  Banks, 399 F.3d at 137. A prisoner is initially committed for 90 days and may earn his way out of the LTSU upon good behavior. *Id.*

2.  The LTSU was maintained at the State Correctional Institute in Fayette following the closure of SCI Pittsburgh.

The remaining Defendants in this action include the following individuals: Lt. Mark Mozingo; Lt. Mackey; Correctional Officer Meeker; Correctional Officer Deran; Correctional Officer Stoker; Correctional Officer Richter (incorrectly identified as "Richie" in the Caption of the Amended Complaint); Correctional Officer Faulkner; Correctional Officer Burton; Lt. Berrier; Jeffrey A. Beard, Secretary of the Pennsylvania Department of Corrections (DOC); and Health Care Administrator Robert Tretinik.   Plaintiff claims that the Defendants violated his rights as protected by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

B.   Plaintiff's Allegations

On March 10, 2008, Plaintiff filed an Amended Complaint concerning events that occurred from May 13 through June 15, 2006 (doc. no. 6).   In his first claim, he alleges that on May 14, 2006, he smeared feces on the walls of cell LB-1009 where the sprinkler already was pulled out. At that time, Lt. Mozingo, performed an illegal extraction with Defendants Meeker and Doran and several others.   Plaintiff claims Defendant Mozingo sprayed him twice with mace when he refused orders.   Then, Mozingo left and came back with another extraction team in uniform.   He complied with the order to cuff up and was escorted to a "strip cage" and placed in illegal restraints waist chains, hand cuffs and ankle cuffs.   He then was placed in cell LB-2021 with no mattress, blanket, running water, t-shirt or underwear.   He claims that Defendant Mozingo used the mace maliciously and sadistically for the purpose of causing harm.   He further complains that he was denied medical assistance in that he could not wipe his face or clean the chemical agent off of his body and out of his eyes because there was no running water.   He claims he was placed in security restraints with a black transportation box to sleep in and a cold cell with no mattress with shackles on his ankles, waist chain, wrist restraints and denied all other basic necessities where his eyes and skin burned for days and he was denied medical needs.   He claims that Defendants created an environment which

is unhealthy by using physical and psychological torture tactics.  He states that Defendants violated DOC policy on use of restraints as well as their professional code of ethics.

His second claim is that on May 15, 2006, Correctional Officer Knizer handed him his lunch tray, which had a spit of tobacco on it.  Plaintiff came loose from his security restraint and began to smear feces on his cell wall in LB-1021 and then calmed down.  Lt. Mozingo came upstairs and they had unpleasant words between them.  Mozingo then noticed that Plaintiff was out of his security restraint and Plaintiff was extracted from his cell and placed in the strip cage where he was placed in a restraint chair and a spit mask.  Plaintiff alleges that the extraction team tightened the chair belts so as to cut off his circulation.  After nine hours, Lt. Mozingo and R.N. Ryan took Plaintiff out of the restraint chair, placed him in ankle, wrist and waist restraints attached to a security black box, and placed him in cell LA-1007 for two days.  Plaintiff claims he suffered injuries, including swelling of his right hand, cuts in his wrist, stomach discomfort for holding his bowel movements while in the restraint chair, poor circulation, and inability to sleep while in restraints.

Plaintiff's third claim is that on May 18, 2006, he smeared feces on his cell walls and security camera because he was being monitored illegally without psychiatric approval.  Lt. Mozingo and Defendants Richter, Fisher, Stoner and Faulkner extracted Plaintiff from his cell and placed him in the cell LB-1010 where a spit mask was placed on his face.  Plaintiff alleges that Defendant Richter used an electric shield to electrocute him during the extraction while Defendant Richter used the hand held IBID to electrocute him until he defecated down his legs while Defendants Mozingo, Faulkner, and Stoner yelled at him to stop resisting.  Plaintiff was forced to a strip cage and placed in ankle, wrist and waist restraints attached to a security black box, and

placed him in unsanitary cell LB-1010 for two days.  Plaintiff claims he suffered injuries as a result of his restraints and was denied all basic necessities including pen, paper and mail.

Plaintiff's fourth claim is that on May 21, 2006, he was extracted from his cell for smearing feces on the walls and camera in order to get a shower.  After his shower, Lt. Mozingo ordered him to cuff up and forced him to walk out of the shower naked to the strip cage where he was placed in wrist and waist restraints and taken back to cell LB-1010, which was covered with Plaintiff's feces.  He further claims that the cell was illuminated twenty-four (24) hours a day, which caused him sleep deprivation.  Plaintiff claims he suffered injuries as a result of his restraints.

Plaintiff's fifth claim is that on May 30, 2006, he smeared feces on the security camera, floor and window of his cell to prevent observation of his cell and to get a shower.  Lt. Berrier and his extraction team escorted Plaintiff to the shower and afterward, Plaintiff was taken to the strip cage and placed in ankle, wrist and waist restraints and taken back to cell LB-1010, which was covered with Plaintiff's feces.  Plaintiff claims he suffered injuries as a result of his restraints, including sleep deprivation, cuts due the ankle shackles, denied running water, toilet paper, soap, and shoes.

Plaintiff's sixth claim is that on June 5, 2006, Lt. Mozingo removed Plaintiff's ankle shackles after twenty-one days.  As a result, Plaintiff suffered deep cuts on his ankles.  He claims that he was living in cell LB-1010 since May 17, 2006 without basic necessities such as toilet paper, soap, and tooth brush.

Plaintiff's seventh claim is that on June 6, 2006, he smeared feces on the camera, cell door and windows.  The extraction team placed him in the shower and afterward made him walk naked to the strip cage.  On the way, Defendant Richter stepped on Plaintiff's feet, elbowed him in the face and pushed him.  When Plaintiff spit at Richter, Defendant Mackey sprayed him with a

chemical agent and denied him medical treatment afterward.  Plaintiff claims he suffered injuries as a result of his restraints.

Plaintiff's eighth claim is that on June 9, 2006, he smeared feces on the camera, cell door and windows.  The extraction team placed him in the shower while the workers half cleaned his cell.  Afterward, he was forced to walk naked to the strip cage where he was placed in restraints and a spit hood.  Plaintiff claims he suffered injuries as a result of his restraints, including sleep deprivation and psychological problems.

Plaintiff's ninth claim concerns his confinement in the LTSU.  Specifically, he claims that he did not volunteer for participation in the LTSU psychological experiments and did not volunteer for the psychologist to submit diagnoses, evaluations or examinations. which have caused him to exhibit destructive behavior such as smearing feces, self defecating, paranoia, rage and depression.  He claims that Defendants have violated his right to petition the government for redress of grievances, his right to be free from unreasonable seizures, his right to due process, and his right to be free from cruel and unusual punishments, including the right to be placed in general population, the right to telephone calls, the right to work pay or idle pay, the right to parole, etc.  He claims that Jeffrey Beard created the LTSU for alleged behavior modification purposes but in reality, it's purpose is for medical experimentation.

**B. Standard of Review**

Presently pending is Defendants' Motion for Summary Judgment (doc. no. 63).  Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  Summary judgment may be granted

against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case.").  The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth ". . . specific facts showing that there is a genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991) (quoting Anderson, 477 U.S. at 251-52).  If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted.  Anderson, 477 U.S. at 249-50.

### C. Liability under 42 U.S.C. § 1983

Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements.  He must allege:  1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451

U.S. 527, 535 (1981), *overruled in part on other grounds*, <u>Daniels v. Williams</u>, 474 U.S. 327, 330-331 (1986).

To establish personal liability against a defendant in a section 1983 action, that defendant must have <u>personal</u> involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976). Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. <u>Rode</u>, 845 F.2d at 1207.

The issues at bar concern whether Defendants have violated any of Plaintiff's constitutional rights. His claims are discussed seriatim below.

### D.  First Amendment

The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.

Plaintiff baldly alleges that Defendants have violated his right to access to the courts.

The First Amendment guarantees prisoners the fundamental right to meaningful access to the courts. <u>Bounds v. Smith</u>, 430 U.S. 817 (1977). However, this right is not unlimited.

> [The Constitution] does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.

> The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Lewis v. Casey, 518 U.S. 343, 355 (1996).

Thus, the Supreme Court has instructed that the right to access to the courts means that a prisoner must be provided with a "reasonably adequate opportunity" to present claimed violations of fundamental constitutional rights to the courts.  *Id*. at 351 (citation omitted).  To ensure this right, the state must provide indigent inmates with the materials necessary to draft and mail legal documents.  Bounds, 430 U.S. at 824-25.  Notwithstanding, the right of access does not require that indigent inmates be provided with unlimited free postage or materials; a state is entitled to adopt reasonable restrictions in light of prison budgetary considerations.  *See* Bach v. Coughlin, 508 F.2d 303, 307 (7th Cir. 1974).

In Lewis v. Casey, 518 U.S. 343 (1996), the Supreme Court held that, in order to successfully challenge a denial of the right of access to the courts, it is not enough for an inmate to establish that the law library provided was inadequate or he was denied access either to the law library or to legal materials; rather, he must establish that such inadequacies in the library or in accessing legal materials caused him actual harm.  In Christopher v. Harbury, 536 U.S. 403 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim of right to access to the courts.  Specifically, the Supreme Court held that, in order to state a claim for denial of access to courts, a party must identify all of the following in the complaint:  1) a non-frivolous, underlying claim: 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit.  Christopher, 536 U.S. at 415.

The Court explained that the first requirement mandated that the plaintiff specifically state in the complaint the underlying claim in accordance with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure to the same degree as if the underlying claim was being pursued independently.  Christopher, 536 U.S. at 417.  In this regard, the statement must be sufficiently specific to ensure that the district court can ascertain that the claim is not frivolous and that the "the 'arguable' nature of the underlying claim is more than hope."  Id.  The second requirement requires a Plaintiff to clearly allege in the Complaint the official acts that frustrated the underlying litigation.  Third, a Plaintiff must specifically identify a remedy that may be awarded as recompense in a denial-of-access case that would not be available in any other future litigation.  Id. at 414.

Here, Plaintiff has failed to identify any legal action he was unable to pursue as a result of Defendant's alleged actions.  He makes a statement that he missed a court date due to one of his cell extractions, but does not identify what action such court date pertained to.  Nor has he alleged a remedy that may be awarded as recompense but that is not otherwise available in a future suit.  Thus, Defendants are entitled to summary judgment as to Plaintiff's claimed denial of access to courts.[3]

### E. Fourth Amendment - Illegal Seizure

---

3.  In addition, to the extent Banks is alleging a violation of his right to use the prison grievance procedures, he can not state a claim.  Inmate grievance procedures, in themselves, do not confer a liberty interest protected by the due process clause in the inmate grievance procedures.  *See, e.g.*, Rhoades v. Adams, 194 F. App'x. 93  (3d Cir. 2006); McGuire v. Forr, Civ. No. 94-6884, 1996 WL 131130 (E. D. Pa. Mar. 21, 1996), *aff'd,* 101 F.3d 691 (3d Cir. 1996); Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir.1996).

Plaintiff also claims that he has a right to be free from unreasonable seizures.  This claim seeks to impose liability under the Fourth Amendment, which provides as follows.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

First, the Fourth Amendment's proscription against unreasonable searches does not apply to a prisoner's cell or to prisoner's property.  *See* Hudson v. Palmer, 468 U.S. 517, 526 (1984) (holding that an inmate has no reasonable expectation of privacy in his prison cell entitling him to the protections of the Fourth Amendment).  Consequently, Plaintiff's allegations construed as a claim alleging an illegal cell search and seizure of his property do not state a violation of his Fourth Amendment rights.

Second, inmates retain only a "limited right to bodily privacy" under the Fourth Amendment.  Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir.1992).  To the extent that Plaintiff is trying to raise a Fourth Amendment claim regarding Defendants' actions in placing him in bodily restraints and/or walking him naked from the shower to the strip cell, such actions must be considered under the Eighth Amendment; extending a Fourth Amendment remedy to Plaintiff is unwarranted.  *See* Perez v. Hewitt, Civ. No. 04-10112, 2008 WL 780628, 3 (S.D.N.Y. March 24, 2008) (quoting Hudson, 468 U.S. at 530) ("Our holding that respondent does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment does not mean that he is without a remedy.... The Eighth Amendment always stands as a protection against cruel and unusual punishments."); Peckham v. Wisconsin Dept. of Corrections, 141 F.3d 694, 699 (7th Cir. 1998) (J. Easterbrook concurring) ("What Hudson and Johnson hold is that convicts lack any reasonable

expectation of privacy that may be asserted against their custodians and that searches of cells and

other places where contraband may be hidden, including the space under one's clothing, need not

be justified by any particular quantum of suspicion. That principle should not be impugned."). Thus,

Defendants are entitled to summary judgment with respect to Plaintiff's Fourth Amendment claims.

### F. The Eighth Amendment

Plaintiff makes several allegations that invoke liability under the Eighth Amendment,

which provides as follows.

> Excessive bail shall not be required, nor excessive fines imposed, nor
> cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The Eighth Amendment protects individuals against the infliction of "cruel and

unusual punishments."   This protection, enforced against the states through the Fourteenth

Amendment, guarantees incarcerated persons humane conditions of confinement.  In this regard,

prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care,

and must "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511

U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

Notwithstanding, not every injury raises constitutional concerns.  A prison official

violates the Eighth Amendment only when two requirements are met.  The inmate must show that:

1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to

such risk.  Farmer, 511 U.S. at 834.  The first element is satisfied when the alleged "punishment"

is "objectively sufficiently serious." *Id*.  In determining whether a prisoner has alleged a risk that

is  objectively serious, a court must consider not only the seriousness of the potential harm and the

likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates

contemporary standards of decency.  In other words, the prisoner must show that the risk of which

11

he complains is not one that today's society chooses to tolerate.  Helling v. McKinney, 509 U.S. 25, 35 (1993).

The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind.  The Supreme Court clarified this deliberate indifference standard in Farmer as follows.

> We reject petitioner's invitation to adopt an objective test for deliberate indifference.  We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  This approach comports best with the text of the Amendment as our cases have interpreted it.  The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."  An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. . . .  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-838 (emphasis added).

### 1. Conditions of Confinement

Plaintiff alleges that the conditions of his confinement in the LTSU violated the Eighth Amendment prohibition against cruel and unusual punishment.  Plaintiff fails to submit any evidence to demonstrate that the conditions of his confinement in the LTSU deprived him of any basic human need such as food, clothing, shelter, sanitation, medical care or personal safety.  Neither classification nor confinement to segregation, either administrative or punitive, implicates the Cruel and Unusual Punishment Clause of the Eighth Amendment unless the conditions themselves are cruel and unusual.  Hutto v. Finney, 437 U.S. 678, 686 (1978); Spaight v. Coughlin, 104 F.3d 350

(Table), 1996 WL 518507 (2d Cir. 1996), *cert. denied*, 117 S.Ct. 972 (1997); Young v. Quinlan, 960 F.2d 351, 363 (3d Cir. 1992); Sheley v. Dugger, 833 F.2d 1420, 1428-29 (11th Cir. 1987); Gibson v. Lynch, 652 F.2d 348, 352 (3d Cir. 1981) ("administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment") (citing Hutto), *cert. denied*, 462 U.S. 1137 (1983).

  The Constitution does not mandate comfortable prisons. Rhodes, 452 U.S. at 349. Prisons housing "persons convicted of serious crimes cannot be free of discomfort." *Id. Accord* Griffin v. Vaughn, 112 F.3d. 703 (3d Cir. 1997) (restrictive conditions in administrative custody in the Pennsylvania state correctional institutions, in and of themselves, do not violate the Eighth Amendment).

  The Superior Court of Pennsylvania recently rejected a similar Eighth Amendment claim regarding the LTSU wherein it made the following observations.

>   The basic conditions in this most restrictive of units designed for the most severe behavioral problems in the prison population are, perhaps not surprisingly, very unpleasant. There is a regular problem of feces throwing and the accompanying stench, which has been recently only partially corrected by a modification of the cell doors. Another practice of stopping up toilets until they run over and flood the cells, is not uncommon and can lead to similar unsanitary conditions. Although the institution has a specialized team to go in and clean and sanitize after such incidents, the evidence suggests that there are sometimes periods of delay during which the inmates are residing and even eating their meals within the sight and smell of human waste. There was no evidence, however, that inmates['] food itself was contaminated with this waste. Although petitioners allege that the staff actively encourage the throwing of feces, the evidence did not support this allegation.
>
>   As noted above, the inmates in the LTSU have 23 hours of solitary confinement in their cells per day with one hour a day in the yard. There is considerable noise described as banging and screaming on the unit at all hours of the day and night and the lights are left on twenty-four hours a day. Many of the inmates are described as suffering from mental and emotional illnesses, although

the severely mentally ill are apparently housed in a separate unit. This Court had the opportunity to visit the Psychiatric Unit which is staffed with a full-time nurse, and the inmates appear well managed and orderly.  It is not clear to this Court whether the mental and emotional conditions demonstrated in the LTSU contribute or cause the extreme behavioral issues that landed these inmates in the LTSU or whether those types of conditions are in part caused by long periods of solitary confinement in such a unit.

There have been problems with the heat during which the cells have been quite cold during the winter months, although extra blankets appear to have been available at those times. ...  At times, pepper spray is used to control unruly inmates, and the spray lingers in the air, causing problems for the surrounding inmates.

. . .

To punish the LTSU inmates for misconducts, they are sometimes put in "alternate housing," which involves being put into a cell without the inmate's property or clothing, with a smock and no underclothing to wear, a mattress and a "security blanket." According to the LTSU policy, where an inmate's misconduct has involved the use of the mattress, such as using it to create a barricade or destroying it for any purpose, this alternate housing would exclude a mattress and require the inmate to sleep on a metal bed frame or on the concrete slab. ...  While in this alternate housing, if the inmate's misconduct has involved misuse of food or utensils (cups or containers have at times been used to collect fluids or feces to use against staff or other inmates), the inmate will be given only a "nutritional food loaf" to eat during the duration of the punishment, which is a frozen concoction of rice and some sort of starch. This is done only for short durations until the inmate is brought into conformity and the process is done under medical supervision. The water is also controlled from outside the cell during these punishments to avoid the inmate causing a flood, although water to drink is apparently made available every few hours.  ... In one instance, Mr. Rivera testified to having been put in a "four-point restraint" for a misconduct, which constituted being chained to a metal bed frame by all four limbs, during which restraint he was unable to use the bathroom and was forced to soil himself with urine and feces.  Prison officials noted this was after he attacked a guard and had to be forcefully removed from his cell.

. . . A counselor is available on the unit once a month, but must share time with all the inmates and there is no privacy for counseling. . . . There is a system of inmate reviews which includes

> monthly reviews by the Unit Management Team and quarterly reviews by a Program Review Committee. These reviews, in addition to the established grievance procedures, provide opportunities for the inmates to discuss problems and grievances that they might have with the conditions of their confinement as well as to have their behavioral status reviewed and possibly some of their disciplinary custody time set aside.

Rivera v. Pennsylvania Dept. of Corrections  837 A.2d 525, 530-532 (Pa. Super. 2003).

The Superior Court held that the conditions of confinement in the LTSU, as explained above, did not deprive the prisoners of the minimal civilized measure of life's necessities, or at least a single, identifiable human need. Rivera, 837 A.2d at 534 (Pa.Super. 2003) (citing Wilson v. Seiter, 501 U.S. 294 (1991)). Like Rivera, Plaintiff has failed to evidence conditions that will satisfy the objective component of an Eighth Amendment claim. *Accord* Griffin v. Vaughn, 112 F.3d. 703 (3d Cir. 1997) (holding that the restrictive conditions in administrative custody in the Pennsylvania state correctional institutions, in and of themselves, do not violate the Eighth Amendment); Fortson v. Kelchner, Civ. No. 08-532, 2009 WL 693247, at *3 (W. D.  Pa. Mar. 13, 2009) (granting Defendants' Motion to Dismiss as to Plaintiff's Eighth Amendment claim regarding confinement in the RHU and SMU); Pressley v. Blaine, 544 F.Supp.2d 446, 453 (W. D. Pa. 2008) (holding that 1080 days of disciplinary confinement did not implicate the Eighth Amendment); Dantzler v. Beard, Civ. No. 05-1727, 2007 WL 5018184, at *11-12 (W.D. Pa. Dec. 6, 2007) (holding that the conditions of confinement in the SMU and LTSU did not amount to cruel and unusual punishment in violation of the Eighth Amendment); Woods v. Abrams, Civ. No. 06-757, 2007 WL 2852525, 14 (W. D. Pa. Sep. 27, 2007) (holding that the conditions of confinement in the LTSU did not satisfy the objective component of an Eighth Amendment claim); [Gary] Banks v. Beard, Civ. No. 03-659, 2006 WL 2192015, at *11 (W. D. Pa. Aug. 1, 2006) (same). Consequently, Defendants are entitled to summary judgment as to this claim.

2.     Unsanitary Conditions

Plaintiff further alleges that he was confined in unsanitary conditions from May 18, 2006 through June 9, 2006, while he was confined in the LTSU.  Specifically, Plaintiff complains about the presence of feces in his cell and the fact that he was housed in a dry cell for periods of time.  The record is clear that, to the extent there was feces in Plaintiff's cell, Plaintiff was responsible for putting it there.  It is also clear that efforts were made to clean Plaintiff's cell windows and camera each time he was extracted therefrom.  Plaintiff's allegations simply do not rise to the level of an Eighth Amendment violation.  *See* Schaeffer v. Schamp, Civ. No. 06-1516, 2008 WL 2553474, at *6 (W. D. Pa. June 25, 2008) (holding that plaintiff's "claims that he was placed in a hard cell for ten days without a mattress, soap, toilet paper, running water, legal supplies, his prescription medication and only received one meal a day" were insufficient to constitute an Eighth Amendment violation); Williams v. Campbell, Civ. No. 07-885, 2008 WL 2816089, *4 (E. D. Pa. July 18, 2008); Fortune v. Basemore, Civ. No. 04-377, 2008 WL 4525373, 12 (W. D. Pa. Sept. 29, 2008) (denial of exercise and showers for fifteen days did not result in an Eighth Amendment violation); Allebach v. Sherrer, Civ. No. 04-287, 2005 WL 1793726 (D.N.J. July 27, 2005) (holding that denial of running water, religious items, visitation, recreation, use of the telephone, mattress and clothing for thirty-six (36) days was not cruel and unusual punishment under the Eighth Amendment).[4]  Thus, summary judgment should be entered in favor of the defendants with regard to Plaintiff's cell amenity related conditions of confinement claims.

3.     Excessive Force

---

4.  *Accord* O'Leary v. Iowa State Men's Reformatory, 79 F.3d 82, 83 (8th Cir. 1996) (inmate deprived of underwear, blankets, mattress, exercise, visits did not state an Eighth Amendment violation); Seltzer-Bey v. Delo, 66 F.3d 961, 963 (8th Cir.1995) (inmate placed in strip cell without clothing, bedding, or running water, with a concrete floor, a concrete slab for a bed, and cold air blowing on him did not state an Eighth Amendment violation).

Plaintiff's predominant claim is that Defendants used excessive force by their use of OC spray, body restraints, a restraint chair, and electric taser devices between May 13, 2006 and June 9, 2006.  The Cruel and Unusual Punishments Clause of the Eighth Amendment protects inmates against the application of excessive force by correctional officers.  *See* Whitley v. Albers, 475 U.S. 312, 318-19 (1986).  What is required to prove an Eighth Amendment violation "varies according to the nature of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S. 1, 5 (1992). In an excessive force claim, the core judicial inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Hudson v. McMillian, 503 U.S. 1, 7 (1992).  Factors relevant to this inquiry include:  the need for application of force; the relationship between that need and the amount of force used; the threat reasonably perceived by the responsible officials; and any efforts made to temper the severity of a forceful response.  Hudson, 503 U.S. at 7 (citations omitted).  The absence of serious injury is a relevant, but not dispositive, additional factor to be considered in the subjective analysis.  *Id.*

In reviewing excessive force cases in the prison context, the Supreme Court has instructed as follows.

> When the ever-present potential for violent confrontation and conflagration, ripens into actual unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators, carries special weight. Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials

17

> who have made a considered choice.  Accordingly, in ruling on a
> motion for a directed verdict in a case such as this, courts must
> determine whether the evidence goes beyond a mere dispute over the
> reasonableness of a particular use of force or the existence of
> arguably superior alternatives.  Unless it appears that the evidence,
> viewed in the light most favorable to the plaintiff, will support a
> reliable inference of wantonness in the infliction of pain under the
> standard we have described, the case should not go to the jury.

Whitley v. Albers, 475 U.S. 312, 321-322 (1986) (internal quotations omitted).

As an initial matter, the Court notes that a prison guard's use of a restraint chair, body restraints, OC spray or IBID taser gun does not, in and of itself, allege a violation of the Eighth Amendment.  *See, e.g.*, Fuentes v. Wagner 206 F.3d 335, 345 (3d Cir. 2000) (defendants entitled to summary judgment with regard to use of restraint chair where there was no evidence that prison officials placed him in the chair maliciously and sadistically to cause harm); Dixon v. Toole, 225 F. App'x 797, 799 (11th Cir. 2007) (no Eighth Amendment violation with respect to four point restraints where prisoner suffered no physical injury); Parks v. Williams 157 F. App'x 5, 6 (9th Cir. 2005) (same); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that a "single use of the taser gun causing a one-time shocking" against a "hostile, belligerent, and uncooperative" arrestee in order to effectuate the arrest was not excessive force in the totality of the circumstances); Jasper v. Thalacker, 999 F.2d 353, 354 (8th Cir. 1993) (using stun gun to subdue an unruly inmate did not violate Eighth Amendment where plaintiff failed to prove that the officers used the stun gun "sadistically or maliciously" to cause harm); Caldwell v. Moore, 968 F.2d 595, 602 (6th Cir. 1992) (use of stun gun against disruptive prisoner to restore discipline and order does not violate Eighth Amendment); Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir. 1988) (policy of allowing use of taser guns on inmate who refuses to submit to a strip search does not constitute cruel and unusual punishment).

18

Thus, the Court must review the evidence presented regarding the specific instances alleged in the Amended Complaint.[5]  The record facts are as follows.

On May 14, 2006, Plaintiff's cell flooded due to a broken sprinkler.  On that date, Plaintiff wrote on his cell walls and windows with feces.  At approximately 3:30 p.m., the shift commander, Charles Simpson, authorized a cell extraction of inmate Banks and placement into RIPP restraints (doc. no. 63-1, p. 3).[6]  Banks was also cleared for the use of Oleoresin Capsicum (OC) (commonly known as pepper spray)[7] and the Electronic Body Immobilizing Device (EBID) (commonly known as a taser).[8]  After these authorizations were in place, the ventilation system was shut down and Lt Mozingo assembled a Modified Cell Extraction Team (also known as a Force Compliance Team), consisting of Officer Doran - equipped with a baton, Officer Cummings - equipped with leg shackles, Officer Yatchyshyn - equipped with hand held EBID, Officer Meeker equipped with the RIPP Treatment Belt.  The following can be observed in the video footage of the May 14, 2006 events.  Mozingo and his team approached Plaintiff's cell LB 1009, which was smeared with feces, and asked if he would agree to be handcuffed and removed from his cell voluntarily.  Plaintiff refused and barricaded the food aperture with a security blanket to prevent the officers from handcuffing him.  When Plaintiff refused multiple orders to remove the barricade and submit himself to be handcuffed, defendant Mozingo administered a short burst of OC into

---

5. As exhibits to its Motion Defendant provided videotapes of each of the 7 incidents Plaintiff complained of, each of which was reviewed by the court.

6. As Defendants point out, the videotape evidence reveals that RIPP restraints are a type of fabric restraint belt that secures and inmate's hands to his waist.

7. OC spray causes involuntary closure of the eyes, respiratory inflammation, and temporary loss of muscular strength and coordination.

8. An EBID is a non-lethal electrical device used to temporarily immobilize an individual (doc. no. 63-1, p. 47).

Plaintiff's cell.  Plaintiff remained at his cell door window screaming at the guards and barricaded his door with his mattress yelling "try it now bitch." A second burst of OC was administered and Plaintiff remained standing in his cell clapping his hands.  There is no indication in the videotape that the pepper spray caused any irritation to his eyes or skin.

At that point, the team left and Mozingo assembled a full Extraction Team consisting of Officer Doran - equipped with a EBID shield, Officer Cummings - responsible for high right, Officer Yatchyshyn - responsible for high left equipped with handcuffs, Officer Meeker - low right equipped with hand held EBID, Officer Skobel - low left equipped with leg shackles, Officer Hayden - equipped with handcuffs, tether and baton, and RN Hovanic to provide medical care.  The Extraction Team commenced to Plaintiff's cell where he complied with Mozingo's orders and was voluntarily handcuffed and removed from his cell.  Plaintiff was taken to the shower, strip searched, and then given a clean shirt and undershorts.  He was re-cuffed, shackled, and placed in RIPP restraints and taken to cell LB 2021, known as a hard cell without a mattress or personal property and in which the water had been temporarily shut off.  The videotape further shows that immediately after being secured in the new cell, Plaintiff began trying to escape from his RIPP restraints and threatening the officers.

About twenty minutes after he was secured in cell LB 2021, Nurse Hovanic attempted to perform a medical assessment.  At that time, Plaintiff stated that he did not have any injuries and refused assessment and eye flush for OC gas use (doc. no. 63-1, p. 56).  As a result of his behavior, Plaintiff was issued misconduct no. A737226 charging him with destroying, altering or tampering with property in regards to the damaged sprinkler found in Plaintiff's cell (doc. no. 63-1, p. 41).

On May 15, 2006, at approximately 9:30 a.m., Plaintiff broke the RIPP Treatment Belt where the left handcuff attaches to the belt and covered his cell wall with feces.  He

continuously pounded on his cell window with the broken handcuff and stated that he broke the sprinkler in his cell. Because he previously had broken the sprinklers in two other cells, the water was turned off in his cell so it was unknown whether the sprinkler was broken. From 9:30 to 10:50 he threatened staff, pounded on the windows and stated that he was going to destroy every cell that he was placed in. It was determined that Plaintiff would be placed in the Restraint Chair and a Cell Extraction Team was assembled consisting of Officer Akorn - equipped with the EBID shield, Officer Burton - responsible for high right, Officer McKay - high left equipped with handcuffs, Officer Knizer - low right equipped with hand held EBID, Officer Addis - low left, Officer Smith - equipped with handcuffs, tether and baton, and Nurse Bilitski for any medical attention (doc. no. 63-1, p. 63). The videotape shows that the team went to Plaintiff's cell where he complied with the initial orders to submit himself for handcuffing. He was removed from his cell, placed in a holding area, strip searched and then placed in the restraint chair, where he immediately began yelling and threatening to beat the officers. In addition, he taunted the officers to make the restraints tighter, stating "this ain't gonna stop me," "is that the best you can do?" "pull harder," and "I'm comin' outta' this shit." He was given misconduct no. A737230 charging him with threatening an employee or their family with bodily harm and destroying, altering or tampering with property, *i.e.*, the broken RIPP belt.

According to his medical chart, at 12:52, Plaintiff was secured in the restraint chair and the straps were checked for tightness and his circulation was examined by the medical department (doc. no. 63-2, p. 7). At 2:50, Nurse Noel examined Plaintiff who complained of swelling of his right hand. He was offered exercise to all four points but only wanted to exercise his arms, which he was allowed to do for two minutes. All four extremities were then checked for circulation. At 5:00 p.m., Plaintiff complained of chest pain and was examined by medical. His

pulse was regular and his lungs were clear and he was offered exercise to all four points, which he did.  No cardiac issues were found (doc. no. 63-2, p. 7).   Approximately eight and one-half hours later, around 8:00 p.m., Plaintiff was removed form the restraint chair and evaluated by the medical department. The medical examination of Plaintiff conducted after he was removed from the restraint chair revealed a bruise on his right wrist (doc. no. 63-2, p. 5).  The nail blanching test was performed with normal results.  Plaintiff was advised to keep his wrist elevated and was placed on sick call for the following day.  On May 16, 2006, Plaintiff was examined by PA Chris Meyer who found no visible cuts and good capillary refill (doc. no. 63-2, p. 8).

Plaintiff complains that he suffered pain due to having to hold his bowel movements while he was in the restraint chair.  He further states that he suffered pain and swelling and loss of feeling in his hands, shoulders, ankles and feet.  He further complains that he was placed in shackles and a cold cell after he was removed from the restraint chair. The Court notes that Plaintiff was placed in the chair for using his excrement to destroy his cell by writing on the walls with it.  The human body only produces a limited amount of excrement in a day.  It seems somewhat unrealistic that Plaintiff would need to move his bowels again in so short a time.  Moreover, no where does he claim that he asked to use the restroom while he was in the restraint chair and was refused by any of the Defendants.  Finally, when Plaintiff complained of medical concerns, he was seen by the medical department in a timely manner.

On May 18, 2006, Plaintiff smeared feces on himself, his cell door window and in-cell security camera making it impossible to see inside Plaintiff's cell, which created a security concern (doc. no. 63-2, p. 25).  A Cell Extraction Team was assembled by Lt. Mozingo to remove Plaintiff from his cell so that it could be cleaned.  The team consisted of the following:  Officer Mozingo - equipped with OC; Officer Fisher - equipped with the EBID shield; Officer Akorn -

responsible for high right; Officer Faulkner - high left with handcuffs; Officer Richter - low right

with hand held IBID; Officer Keller -responsible for low left; Officer Stoner -equipped with baton,

handcuffs and tether; RN Bilohlavek - responsible for medical attention.  Plaintiff was cleared for

OC and EBID and the ventilation was shut off (doc. no. 63-2, p. 25) in cell LB 1010.  Plaintiff

complied with orders and submitted himself to be voluntarily handcuffed.  After the cell door was

opened, Plaintiff allegedly bit defendant Stoner on the hand, who was wearing two pair of plastic

gloves which were torn during the incident.  At that point, Plaintiff was taken down onto his bed and

the hand-held EBID was applied.  Plaintiff complains that he was electrocuted until he defecated

down his legs.  He was taken out of his cell to a holding area where he was strip-searched.  During

the entire period, Plaintiff was verbally assaultive and threatened the officers that he was going to

throw shit on them and he was taking them all to court.  Nurse Bilohlavek photographed the marks

left on Plaintiff by the EBID and a cut on his right hand.  Plaintiff was given clean clothes and black

box restraints were applied.  Plaintiff then was returned to his cell, which had been cleaned.

          As a result, Plaintiff was issued misconduct nos. A756643 and A756644.    In

A756644, Plaintiff was charged with destroying, altering, tampering with property, using abusive

language, refusing to obey an order and threatening an employee or his family based on the

declaration by Officer Richter as follows.

> On the above time and date this officer was assigned
> to the central bubble. While monitoring the camera
> cells I noticed inmate Banks spreading feces on his
> camera and the cell walls.  The inmate was ordered
> over the intercom system to stop spreading feces. He
> then replied you come the fuck down here and stop
> me.  He then proceeded to state that he would kill
> anyone who entered his cell.

Doc. No. 63-2, p. 44.  In misconduct no. A756643, Plaintiff was charged with assault, threatening an employee with bodily harm, and using abusive language, based on the following report by Defendant Stoner.

> On the above date and time, I was attempting to place a spit hood onto inmate CT 8731 Banks.  While putting the hood on Banks bit me tearing my gloves and leaving my hand red and swollen. Also, Banks threatened me by stating as soon as you slip up I'm going to throw shit in your mouth.

Doc. No. 63-2, p. 45.

On May 21, 2006. Plaintiff again completely covered his cell door window and in-cell security camera with feces, making it impossible for the officers to see inside Plaintiff's cell. Banks was in leg shackles and refused to have them removed on May 20, 2006.  When Banks refused orders by Mozingo to uncover his window and camera, a cell extraction team was approved by Lt. Berrier.  The team included the following:  Officer Mozingo - equipped with OC; Officer Akorn - equipped with the EBID shield; Officer Stoner - responsible for high right; Officer Faulkner - high left with handcuffs; Officer Richter - low right with hand held IBID; Officer Addis - responsible for low left with shackles; Officer Knizer -equipped with baton, handcuffs and tether; and RN Kutcher - responsible for medical attention (doc. no. 63-3, pp. 3-4).  When the team arrived at Plaintiff's cell, he complied with orders and submitted himself to be handcuffed.  Because he was covered in feces, he was removed from his cell and taken to a shower cell where he was allowed to bathe.  After his shower, while naked, Plaintiff was handcuffed and moved to a strip cage where he was searched and given a clean T shirt and boxers and then handcuffed in front.  Plaintiff sat secured in the strip cell for a period of time while his cell was cleaned.  Throughout this period of time, Plaintiff can be heard on the video yelling, taunting, and laughing at the guards. Plaintiff can also be heard threatening to take the officers to court.  When Plaintiff's cell window and camera were

cleaned, Plaintiff was escorted from the strip cell back to his cell where he was given a clean mattress and placed back into his cell.  Immediately upon being placed in his cell, Plaintiff began yelling "I'll see ya'll another day."  He claims his walls were not cleaned and still had feces on them. He further claims that the lights were on twenty-four hours a day, which cause him sleep deprivation.  Finally, he claims that his restraints cause him pain and discomfort.  Plaintiff was issued misconduct no. A756656 charging him with destroying, altering, damaging or tampering with property due to his actions in covering his cell and clothing with feces.

On May 30, 2006, Plaintiff again spread feces on his cell door window, the floor and in-cell security camera making it impossible for the officers to see inside Plaintiff's cell.  When Banks refused orders from Unit Manager Zaken to remove the feces from his window and camera, a cell extraction team was approved by Captain Nickleson.   The team included the following: Lt. Berrier - equipped with OC; Officer Akorn - equipped with the EBID shield; Officer Burton - responsible for high right; Officer T. Smith - high left with handcuffs; Officer Cummings - low right with hand held IBID; Officer Knizer -responsible for low left with shackles; Officer Richter - equipped with baton, handcuffs, tether and spithood; and RN Kutcher - responsible for medical attention (doc. no. 63-3, p. 42).  When the team arrived at Plaintiff's cell, he complied with orders and submitted himself to be handcuffed and a spit hood was applied.  Plaintiff was removed from his cell and strip searched.  He then was escorted to a shower cell where he was allowed to bathe. After his shower, Plaintiff was given a clean T shirt and boxers and then put back in restraints, which were checked by Nurse Kutcher (doc. no. 63-4, pp. 4-6).  When Plaintiff's cell window and camera were cleaned, he was escorted back to his cell.  Plaintiff was issued misconduct no. A729069 charging him with using obscene language and refusing to obey an order (doc. no. 63-3, p. 64).

25

On June 5, 2006, a Force Compliance Team was assembled for the purpose of removing Plaintiff's RIPP restraints and leg shackles.  This team included Lt. Mozingo - equipped with OC; Officer T. Smith; Officer Richter -equipped with handcuffs and tether; Officer Faulkner - equipped with spithood; Officer Stoner - equipped with hand held EBID and flex cuff cutter; and RN Bilohlavek - responsible for medical attention (doc. no. 63-4, p. 8).  Plaintiff voluntarily complied with orders, was removed from his cell, his restraints were removed and he was returned to his cell.  Plaintiff alleges that the restraints left his ankles cut "very badly."  A review of Plaintiff's medical records reveals that nurse Bilohlavek examined Plaintiff upon removal of the restraints and determined that he had no cuts on ankles or left wrist, and that a cut on his right wrist appeared to be old and healing (doc. no. 63-4, p. 26).

The next day, June 6, 2006, Plaintiff again spread feces on himself, his cell door, and the in-cell security camera.  Plaintiff also urinated on his cell floor and swept the urine under his door and into the pod area (doc. no. 63-4, p. 29).  When Plaintiff refused to comply with the directions of Unit Manager Zaken to remove the feces from his door and camera, a cell extraction team was assembled by Defendant Mackey. This team included the following:  Lt. Mackey - equipped with OC; Officer Stoner - equipped with the EBID shield; Officer Burton - responsible for high right; Officer Faulkner - high left with handcuffs; Officer Richter - low right equipped with hand held IBID; Officer Knizer -responsible for low left and equipped with shackles; Officer Smith - equipped with baton, handcuffs, tether and RIPP restraints; and RN Vilgoss - responsible for medical attention (doc. no. 63-4, p. 31.  Prior to the extraction, Plaintiff was medically cleared for the use of OC and the EBID.  When the team arrived at Plaintiff's door, he agreed to voluntarily cuff up.  The video tape shows that Plaintiff was removed from his cell, escorted to the showers, and allowed to bathe. Throughout his time in the shower, Plaintiff was at the shower cell door screaming

and threatening the officers.  After showering, Plaintiff was re-cuffed and escorted to a holding area where he continued to issue threats.  Plaintiff was given clean clothes and then placed in RIPP restraints and escorted back to his cell.  Upon arrival at his cell, Plaintiff turned and spit and Defendant Mackey administered a burst of OC to subdue Plaintiff, who was then placed in his cell and secured without further incident.  Nurse Vilgoss examined his restraints for tightness (doc. no. 63-5, p. 5).   Plaintiff was observed rinsing his eyes with his sink in his cell.  When Nurse Vilgoss returned later, Plaintiff refused to have his RIPP restraints checked (doc. no. 63-5, p. 7).  Plaintiff was issued misconduct nos. A729080 charging him with using obscene language and refusing to obey an order (doc. no. 63-4, p. 47) and Misconduct No. A729081charging him with using abusive language, refusing to obey an order, and assault with bodily fluids (doc. no. 63-4, p. 48).

On June 9, 2006, Plaintiff smeared feces on himself, his cell, and the in-cell security camera.  He also urinated on his cell floor and forced the urine out into the common area of the pod (doc. no. 63-5, p. 10).  A cell extraction team was assembled by Defendant Mackey.  This team included the following:  Lt. Mackey - equipped with OC; Officer Burton - equipped with the EBID shield; Officer Albright - responsible for high right; Officer Staley - high left with handcuffs; Officer Faulkner - low right equipped with hand held IBID; Officer Knizer -responsible for low left and equipped with shackles; Officer Smith - equipped with baton, handcuffs, tether and RIPP restraints; and RN Kutcher - responsible for medical attention (doc. no. 63-5, p. 12).  Prior to the extraction, Plaintiff was medically cleared for the use of OC and the EBID.  When the team arrived at Plaintiff's door, he agreed to voluntarily cuff up.  The video tape shows that Plaintiff was removed from his cell, escorted to the showers, and allowed to bathe. After showering, Plaintiff was re-cuffed and escorted to a holding area where he was given clean clothes and then placed in RIPP restraints and escorted back to his cell.  The RIPP restraints were checked by Nurse Kutcher and Plaintiff was

27

returned to his cell.  Plaintiff was issued misconduct no. A729087 charging him with assault, possession of a dangerous substance, encouraging unauthorized group activity and destroying property (doc. no. 63-5, p. 36) and misconduct no. A729086 charging him with threatening an employee with bodily harm (doc. no. 63-5, p. 37).

The Court first notes that all of the actions taken by officers identified above are in accordance with the Pennsylvania Department of Corrections (DOC) policy regarding the Use of Force, DC-ADM 201-1 (doc. no. 63-1, pp. 44-52).  More importantly, examining the circumstances of this case under the appropriate factors, it is clear that the force applied was not so excessive as to present a cognizable Eighth Amendment claim.  Plaintiff's actions in repeatedly destroying his cell created the confrontations; force was applied for reasonably short periods necessary to subdue Plaintiff; and Plaintiff did not sustain any significant injuries.  Contrary to Plaintiff's assertions, the use of the stun gun and chemical agent does not prove that the amount of force was excessive.  Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed).  Moreover, the brief application of the EBID was reasonably necessary to control Plaintiff. *See* Hunter v. Young, 238 F. App'x 336, 339 (10th Cir. 2007) (finding use of taser gun not objectively unreasonable); Jeffers v. Gomez, 267 F.3d 895, 910-11 (9th Cir. 2001) (a prison security measure that is undertaken for the protection of prison officials and the inmate population is constitutional when it is applied in good-faith).

As instructed by the United States Supreme Court, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Whitley v. Albers, 475 U.S. 312, 321-322 (1986).  The Eighth Amendment does not

28

protect an inmate against an objectively *de minimis* use of force.  Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002).  As recognized by the Court of Appeals for the Third Circuit "[t]here exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically."  Reyes v. Chinnici  54 Fed. Appx. 44, 48-49, 2002 WL 31546515, 4 (3d. Cir. Nov. 18, 2002) (holding force was *de minimis* where corrections officer punched inmate in the shoulder to avoid being spit on). *Accord* Thomas v. Ferguson, 361 F.Supp .2d 435, 439-41 (D.N.J. 2004) (finding that, "[e]ven if proven to be true and for no necessary purpose, Defendants' alleged conduct ... does not meet the Constitutional standard for a claim of a malicious and sadistic use of force 'repugnant to the conscience of mankind,' " where inmate alleged he was punched and shoved by corrections officers); Wilson v. Reinhart, 2003 WL 21756393 (D. Del. Jul.29, 2003) (same where officer sprayed inmate in the face with mace).

Here, Plaintiff's allegations and the record evidence, including the medical evidence, fail to describe a use of force that is "repugnant to the conscience of mankind."  Indeed, such a use of force is objectively *de minimis* and insufficient to establish an Eighth Amendment violation. Here, Plaintiff's actions in smearing feces all over his cell walls and windows rendered him a danger both to himself and to everyone else he came in contact with. His placement in restraints was based on his own conduct and obviously was taken to prevent him from endangering himself and others. The restrictions imposed on Plaintiff were non-punitive, instead designed to prevent him from harming himself or destroying property.  Unfortunately, Plaintiff was able to repeatedly engage in this behavior despite being placed in restraints while in his cell.  However, there simply is no evidence upon which a reasonable juror could conclude that any of the Defendants' actions were taken maliciously and sadistically to inflict harm. *See, e.g.*, Trammel v. Keane, 338 F.3d 155 (2d

Cir. 2003) (holding that defendants did not disregard substantial risk to inmate's safety by placing him on behavior action plan that "while indeed onerous, even harsh, was reasonably calculated to correct [the inmate's] outrageous behavior."); <u>Key v. McKinney</u>, 176 F.3d 1083 (8th Cir. 1999) (holding that inmate who was restrained in handcuffs and leg shackles did not suffer a serious deprivation of the minimal civilized measure of life's necessities, as required for Eighth Amendment claim, where, although shackles made it more difficult for inmate to sleep and relief himself, he was not deprived of bedding, food, or bathroom facilities, and he was checked on by a nurse and guard at regular intervals); <u>Hartsfield v. Vidor</u>, 199 F.3d 305 (6th Cir. 1999) (finding no Eighth Amendment violation where prisoner was punished for damaging his cell by being kept in restraints for two eight-hour periods where he was denied fresh water and use of the toilet); <u>LeMaire v. Maass</u>, 12 F.3d 1444, 1460 (9th Cir. 1993) (holding that use of full in-cell restraints, which make it difficult to sleep, eat, drink water, or stay warm, under existing regulations to maintain security and safety do not reflect "deliberate indifference" or malice and sadism); <u>Bruscino v. Carlson</u>, 854 F.2d 162 (7th Cir. 1988) (upholding handcuffing, shackling, boxing of the handcuffs, spread-eagling, and rectal searches as reasonable measures in view of the history of violence at the prison and the incorrigible, undeterrable character of the inmates), *cert. denied*, 491 U.S. 907 (1989); <u>Williams v. Burton</u>, 943 F.2d 1572 (11th Cir. 1991) (holding that placing a disruptive inmate in four-point restraints with adhesive tape covering his mouth was both prudent and proper and did not violate the Constitution), *cert. denied*, 505 U.S. 1208 (1992); <u>Jiles v. Breen-Smith</u>, Civ. No. 08-464, 2009 WL 4827065, 7 (W. D. Wis. Dec. 8, 2009) (specifically holding that this particular plaintiff in this particular case has no Eighth Amendment claim because he has not shown that defendants disregarded a substantial risk of serious harm to him); <u>Jarrett v. Bouchard</u>, Civ. No. 05-195, 2006 WL 2632460 (W. D. Mich. Sept.13, 2006) (finding no Eighth Amendment violation where plaintiff

was restrained and his jaw was injured as a result of the restraint after he attempted to spit on defendants as they were removing him from the shower stall because there was no evidence that the officer did so intentionally). *Accord* McDowell v. Sherrer, 2008 WL 4542475, 1 (D.N.J. Oct. 7, 2008) (granting summary judgment to prison guards with respect to cell extraction based on videotape evidence). Consequently, Defendants are entitled to summary judgment as to this claim.

  3. Failure to Provide Medical Treatment

    Plaintiff also asserts an Eighth Amendment claim alleging failure to provide medical treatment. To state an Eighth Amendment violation in the context of medical treatment, an inmate must show prove two elements: 1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need. Gamble v. Estelle, 439 U.S. 897 (1978).

    The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

    The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).

  a. Serious Medical Need

A plaintiff alleging constitutionally inadequate medical treatment must submit medical evidence of a "serious medical need" sufficient to satisfy the objective component of the test.  Boring v. Kozakiewicz, 833 F.2d 468 (3d Cir. 1987), *cert. denied*, 485 U.S. 991 (1988).  In Boring, the Court of Appeals for the Third Circuit determined that, because plaintiffs failed to produce expert testimony that their injuries were "serious," they failed to meet their burden of proof.  The court explained that expert testimony would not necessarily be required in situations where the seriousness of injury or illness would be apparent to a lay person, *e.g.*, a gunshot wound.  Boring, 833 F. 2d at 473 (citing City of Revere v. Massachusetts General Hosp., 463 U.S. 239 (1983)).  With respect to an ulnar nerve injury and migraine headaches, however, the Court concluded that a fact finder would not be able to determine that the condition was "serious" because the need for treatment did not appear to be "acute."  *Id*.  With respect to a scalp condition and complaints about dental care, the Court found that the complaints merely reflected a disagreement over the proper method of treatment.  In so concluding, the Court noted that "courts will not 'second-guess the propriety or adequacy of a particular course of treatment [which] remains a question of sound professional judgment.'"  *Id*. (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).  Finally, with respect to a prior knee injury, the Court found that the evidence did not establish an acute condition.

> As laymen, the jury would not be in a position to decide whether any of the conditions described by plaintiffs could be classified as "serious."  In these circumstances, the district court properly required expert medical opinion and in its absence properly withdrew the issue from the jury.

Boring, 833 F.2d at 474 (citations omitted).

Here, Plaintiff has not included any evidence to whatsoever to substantiate the existence of any serious medical need.  Moreover, as Defendants point out, the record evidence

belies his contentions in this regard.  As with the medical complaints in Boring, a lay person would not be able to conclude that Plaintiff's unsubstantiated allegations of mental illness constituted a "serious medical need" sufficient to invoke the Gamble standard without expert testimony or evidence.  Thus, Plaintiff has failed to meet his burden of demonstrating a genuine issue of fact about whether Defendants ignored a critical or escalating medical situation or that their actions posed a substantial risk of serious harm.  Because evidence of this nature is required in order for an inmate's claim to succeed, Plaintiff's failure to meet this burden is fatal to his case. Accord Banks v. Beard, Civ. No. 03-659, 2006 WL 2192015, 13 (W. D. Pa. Aug. 1, 2006) (holding that injuries such as cuts, scrapes, scratches, bruises and a swollen black eye simply do not in themselves reflect trauma that necessarily calls for immediate medical treatment from a physician).

        b.      Deliberate Indifference

        Moreover, even if the court were to conclude that Plaintiff has demonstrated the existence of a serious medical need, a finding this Court specifically does not make, he has failed to demonstrate that Defendants were deliberately indifferent to it.  The "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action.  Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410 (1997).  The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified." Id. Moreover, deliberate indifference to a serious medical need of a prisoner is distinguishable from a negligent diagnosis or treatment of a medical condition; only the former conduct violates the Eighth Amendment.  Medical malpractice may give rise to a tort claim in state court but does not

necessarily rise to the level of a federal constitutional violation.  <u>Kost v. Kozakiewicz</u>, 1 F.3d 176,

185 (3d Cir. 1993); <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 67 (3d Cir. 1993).

        The Supreme Court explained the difference between negligence and constitutional

claims in <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1978).  In that case, the prisoner, Gamble, was

injured when a bale of cotton fell on him while he was unloading a truck.  He went to the unit

hospital where a medical assistant checked him for a hernia and sent him back to his cell.  He

returned to the hospital where he was given pain pills by an inmate nurse and then was examined

by a doctor. The following day, his injury was diagnosed as a lower back strain; he was prescribed

a pain reliever and a muscle relaxant.  Over the course of several weeks, Gamble was seen by

several doctors who prescribed various pain relievers and provided him with medical work excuses.

Ultimately, despite his protests that his back hurt as much as it had the first day, medical staff

certified Gamble to be capable of light work.  During the next two months, Gamble received a

urinalysis, blood test, blood pressure measurement, and pain and blood pressure medication.

Subsequently, a medical assistant examined Gamble and ordered him hospitalized for treatment of

irregular cardiac rhythm.

        The Supreme Court held that Gamble's allegations failed to state a claim upon which

relief could be granted against the defendant, both in his capacity as a treating physician and as the

medical director of the Corrections Department.

        Gamble was seen by medical personnel on 17 occasions
spanning a 3-month period . . ..  They treated his back injury, high
blood pressure, and heart problems. Gamble has disclaimed any
objection to the treatment provided for his high blood pressure and
his heart problem; his complaint is "based solely on the lack of
diagnosis and inadequate treatment of his back injury."  The doctors
diagnosed his injury as a lower back strain and treated it with bed
rest, muscle relaxants and pain relievers.  Respondent contends that
more should have been done by way of diagnosis and treatment, and
suggests a number of options that were not pursued.  The Court of

Appeals agreed, stating:  "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing."  But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.

Gamble, 427 U.S. at 107 (internal citations omitted) (emphasis added).

The Plaintiff's allegations, like Gamble's, do not state a constitutional violation, a prerequisite for recovery under 42 U.S.C. § 1983.  The record evidence reveals that the Defendants acted responsibly in attending to his medical needs.  While an intentional refusal to provide any medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.  A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice."  Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981).  Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways to treat an illness.  Young v. Quinlan, 960 F.2d 351, 358 n.18 (3d Cir. 1992); White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).

Taken as true, the Plaintiff's allegations and the record evidence simply do not show that Defendants acted with deliberate indifference to his serious medical needs for purposes of imposing liability under the Eighth Amendment's prohibition against cruel and unusual punishment. Specifically, there is nothing that suggests that Defendants knew that Plaintiff faced a substantial

35

risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.

Thus, Defendants are entitled to summary judgment with respect to this claim.

## G. Fourteenth Amendment

Plaintiff's final claim arises under the Fourteenth Amendment, which provides as

follows.

> Section 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, §1 (emphasis added).

Three kinds of section 1983 claims may be brought against the State under the Due

Process Clause of the Fourteenth Amendment.  Zinermon v. Burch, 494 U.S. 113, 125 (1990).  First,

a plaintiff may bring suit under section 1983 for a violation of his specific rights as guaranteed by

the Bill of Rights.  *Id.*  Second, a plaintiff may assert a Fourteenth Amendment claim under the

"procedural" aspect of the Due Process Clause, which guarantees fair procedure for the deprivation

of a constitutionally-protected interest in life, liberty or property.  *Id.*  Third, a plaintiff may assert

a claim under the "substantive" prong of the Due Process Clause, which bars certain arbitrary,

wrongful government actions regardless of the fairness of the procedures used to implement them.

*Id.* (quoting Daniels v. Williams, 474 U.S. at 331)).

The discussion above reveals that Plaintiff has failed to state a claim upon which

relief may be granted with respect to his specific rights as guaranteed in the Bill of Rights by the

First, Fourth, and Eighth Amendments.  Consequently, his remaining claims will be analyzed under

the procedural and substantive prongs of the due process clause.

1.     Procedural Due Process

The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner.  Meachum v. Fano, 427 U.S. 215, 224 (1976).  The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a convicted criminal's existence that qualify as "liberty interests."  Hewitt v. Helms, 459 U.S. 460 (1983); Morrissey v. Brewer, 408 U.S. 471 (1972).  The types of protected liberty interests are not unlimited.  The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope.  Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Petitioner's claim is whether Defendants' actions impacted a constitutionally-protected liberty interest.  A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation.  Hewitt, 459 U.S. at 466.

a.     Liberty Interest Inherent in Due Process Clause

A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the prisoner be accorded due process.  Gagnon v. Scarpelli, 411 U.S. 778, 781 (1973).  Interests recognized by the Supreme Court that fall within this category include the revocation of parole, Morrissey, 408 U.S. at 471, and the revocation of probation, Gagnon, 411 U.S. at 778.  The Due Process Clause, however, does not create an inherent liberty interest to remain free from restricted housing units.  See, e.g., Hewitt, 459 U.S. at 468; Wolff, 418 U.S. at 556; Montayne v. Haymes, 427 U.S. 236, 242 (1976); Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995); Layton v. Beyer, 953 F.2d 839, 845 (3d Cir. 1992).

Plaintiff's first due process claim alleges that Jeffrey Beard created the LTSU for alleged behavior modification purposes but in reality, it's purpose is for medical experimentation. He claims that he did not volunteer for participation in the LTSU psychological experiments and did not volunteer for the psychologist to submit diagnoses, evaluations or examinations, which have caused him to exhibit destructive behavior such as smearing feces, self defecating, paranoia, rage and depression.  This argument is based Washington v. Harper, 494 U.S. 210, 221-22 (1990) where the Supreme Court held that a prisoner possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs that is inherent under the Due Process Clause of the Fourteenth Amendment.

Although Banks asserts that the LTSU constitutes a psychological experiment, there are no facts alleged to substantiate this.  In response to Defendants' motion for summary judgment, Banks was required to come forward with evidence in support of this claim.  Because he has failed to do so, Defendants are entitled to summary judgment as to this claim.  *Accord* Brown v. Pennsylvania Dept. of Corrections, Civ. No. 07-1436, 290 F.  App'x 463, 465-466 (3d Cir. 2008).

Accordingly, Plaintiff can succeed under the Due Process Clause only if state law or regulation has created a constitutionally-protected liberty interest in remaining free from LTSU confinement.

b.      Liberty Interest Created by Law or Statute

In Sandin v. Conner, 515 U.S. 472 (1995) the Supreme Court dramatically narrowed the range of liberty interests created by law and regulation.  Prior to Sandin, courts reviewed the specific language of the pertinent law or regulation to determine whether the language was unmistakably mandatory in character such that it created a liberty interest.  The Supreme Court announced a new rule in Sandin for determining whether a prisoner had a protected liberty interest

created under statute or regulation by shifting the focus of inquiry from the specific language of the law or regulation to whether the deprivation suffered by the prisoner imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483 (emphasis added).

To the extent that Plaintiff is claiming that Defendants' actions in placing him in the LTSU violated his rights under the Due Process Clause of the Fourteenth Amendment, he is barred from raising that claim under the statute of limitations. In this regard, the limitations period for civil actions brought under 42 U.S.C. § 1983 is determined by state law.[9] Under Pennsylvania law, the applicable limitations period for civil rights actions asserted under 42 U.S.C. § 1983 is two years. See 42 Pa. Cons. Stat. § 5524. Plaintiff was placed in the LTSU in 2001. Thus, he is barred from raising any due process claim regarding his initial placement in the LTSU.

Thus, the only claim Plaintiff can raise under the procedural due process clause concerns his continued placement in the LTSU or similar housing. There is no liberty interest created directly by the Fourteenth Amendment that prevents an inmate from being subjected to programs such as the SMU and/or the LTSU. See Wilkinson v. Austin, 545 U.S. 209, 221 (2005) ("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."). Accord Smith v. Dodrill, Civ. No. 07-2295, 2009 WL 62175 (M. D. Pa. Jan. 8, 2009); Spencer v. Kelchner, Civ. No. 06-1099, 2007 WL 88084 (M .D. Pa. Jan. 9, 2007); Dantzler v. Beard, Civ. No. 05-1727, 2007 WL 5018184 (W. D. Pa. Dec. 6, 2007); Francis v. Dodrill, Civ. No. 04-1694, 2005 WL 2216582 (M. D. Pa. Sept.12, 2005). Cf. Johnson v. Hill, 910 F.Supp. 218, 220 (E. D. Pa. 1996) (holding that, absent a state-created liberty interest that does not

---

9 See Wilson v. Garcia, 471 U.S. 261, 272-76 (1985) (42 U.S.C. § 1983).

exist in Pennsylvania, prisoner placement is a matter of prison administration and a prisoner has no constitutional right to be placed in any particular cell or housing unit).

Thus, in order to succeed on his procedural due process claim, Plaintiff first must demonstrate that his confinement in the LTSU imposed an atypical and significant hardship in relation to the ordinary incidents of prison life.  *See* Sandin v. Conner, 515 U.S. 472, 484 (1995). In Sandin, the Supreme Court held that an inmate's assignment to disciplinary segregation for thirty days did not impose an "atypical, significant deprivation" that implicated an inmate's liberty interest. *Id*. at 486.  In reaching this conclusion, the Court explained that disciplinary segregation at the prison generally "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," the inmate's confinement in segregation "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction," and the inmate's segregation would not "inevitably affect the duration of his sentence." *Id*. at 486-87.

The Court was confronted with a much different situation in Wilkinson v. Austin, 545 U.S. 209, 221 (2005) where it held that placement in Ohio's maximum-security prison, the Ohio State Penitentiary (OSP), did implicate an inmate's liberty interest.  The Court concluded that assignment to the OSP "impose[d] an atypical and significant hardship under any plausible baseline," and listed several factors that distinguished such confinement from the disciplinary segregation at issue in Sandin:

> For an inmate placed in the OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room.  Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components.  First is the duration.  Unlike the 30-day placement in Sandin, placement at [the maximum-security prison] is indefinite and, after an initial 30-day review, is reviewed just annually.  Second is that placement

> disqualifies an otherwise eligible inmate for parole consideration.
> While any of these conditions standing alone might not be sufficient
> to create a liberty interest, taken together they impose an atypical and
> significant hardship within the correctional context. It follows that
> respondents have a liberty interest in avoiding assignment to [the
> maximum-security prison].

Austin, 545 U.S. at 223-24 (citations omitted).

Upon finding a protected liberty interest, the Court next utilized the framework established in Mathews v. Eldridge, 424 U.S. 319 (1976), to evaluate the sufficiency of the particular procedures in determining what process was due an inmate whom Ohio seeks to place in the OSP. In Mathews, the Court held that the requirements of due process, which are flexible and should be tailored to the situation, requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

Mathews, 424 U.S. at 335.

Applying Mathews procedural due process balancing test, the Supreme Court held that Ohio's Policy provided a sufficient level of process for placement in the OSP. Such procedures required the inmate to receive notice of the factual basis for his placement, opportunities for rebuttal, and multiple levels of review of any decision recommending supermax placement. Austin, 545 U.S. at 228.

Applying these teachings to the matter at hand, this Court holds that Plaintiff's continued confinement in the LTSU constitutes an atypical and significant hardship in relation to the ordinary incidents of prison life under any plausible baseline applicable to the Sandin analysis. This Court makes this holding based on its knowledge of the specific conditions of confinement in

41

the LTSU as noted in its many cases concerning such confinement as well as the published opinions concerning the same. *See, e.g.,* Brown v. Pennsylvania Dept. of Corrections, 290 F. App'x 463, 465-466 (3d Cir. 2008); Banks v. Beard, Civ. No. 03-659, 2006 WL 2192015, 15 (W. D. Pa. Aug. 1, 2006). Thus, the question becomes whether Banks received the process that was due for his continued confinement.

Utilizing the Mathews balancing test, our Court of Appeals for the Third Circuit has determined that a state prisoner in long-term administrative segregation received all the process he was due where post-transfer periodic review of his placement in segregation provided the inmate with a meaningful opportunity to challenge the grounds of his continued segregation. *See* Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000). The federal courts in Pennsylvania, including the Court of Appeals for the Third Circuit, have applied the ruling in Shoats to Pennsylvania prisoners housed in restricted housing units such as the LTSU and the SMU. *See* McKeithan v. Beard, 322 F. App'x 194, 199 (3d Cir. 2009) (holding that prisoner's due process claim failed because he received periodic reviews while in the LTSU); Brown v. Pennsylvania Dept. of Corrections, 290 F. App'x, 463, 465-466 (3d Cir. 2008) (same); Dantzler v. Beard, Civ. No. 05-1727, 2008 WL 744740, 1 (W. D. Pa. March 18, 2008) (same for LTSU and SMU). Moreover, the Court of Appeals for the Third Circuit repeatedly has affirmed the holding in Shoats that post-transfer periodic review comports with due process requirements for prisoners serving lengthy sentences who are housed in restrictive administrative custody for indefinite periods of time. *See, e.g.*, Gans v. Rozum, 267 F. App'x, 178, 180-181 (3d Cir. 2008) (prisoner in AC status eleven years ); Williams v. Sebek, 299 F. App'x 104, 107 (3d Cir. 2008) (holding that inmate's continued confinement in administrative custody for five and a half years did not require a remedy because the record showed that he was receiving the required periodic reviews of his status by the Program Review Committee); Brown v. D.O.C. PA,

265 F. App'x 107, 110 (3d Cir. 2008) (same); <u>Bowen v. Ryan</u>, 248 F. App'x, 302, 304 (3d Cir. 2007) (prisoner in AC status twenty years on restricted release status); <u>Delker v. McCullough</u>, 103 F. App'x, 694 (3d Cir. 2004) (holding that periodic reviews by corrections officials of life prisoner in AC status for thirty years satisfied procedural due process requirements).

In the current action, Plaintiff complains about his placement and continued confinement in the LTSU and similar restricted housing units.  As stated above, any claim concerning his initial placement in the LTSU is barred by the two-year statute of limitations.  To the extent he is complaining about his continued placement, he has failed to submit any evidence that he is not receiving regular period reviews and that such reviews do not provide a meaningful opportunity to review his continued placement.  As such, Defendants are entitled to summary judgment as to Plaintiff's due process claims.  *See* <u>Brown v. Pennsylvania Dept. of Corrections,</u> 290 F. App'x, 463, 466 (3d Cir. 2008) (holding that summary judgment was properly granted against a prisoner who failed to satisfy his burden under Rule 56(e)).

2.    <u>Substantive Due Process</u>

As a final matter, the Court will consider whether Plaintiff can state a claim under the substantive prong of the Due Process Clause.  The constitutional right to "substantive due process" under the Fourteenth Amendment protects individuals against arbitrary governmental action regardless of the fairness of the procedures used to implement them.[10]  The Supreme Court has declined to set forth a precise rule outlining the contours of "arbitrary" conduct.  Notwithstanding, in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998), the court instructed

---

10.  *See* <u>Collins v. Harker Heights</u>, 503 U.S. 115, 126 (1992) (the Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression); <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

that the substantive component of the Due Process Clause only can be violated by governmental employees only when their conduct amounts to an abuse of official power that "shocks the conscience."  In so holding, the court reiterated its long standing jurisprudence that only the most egregious official conduct can be said to be "arbitrary" in the constitutional sense.  *Id*. at 849.  The court further instructed that courts should employ a variable range of culpability standards, dependant upon on the circumstances of the case, in determining whether certain actions rise to a constitutionally "shocking" level.  *Id*.

In Lewis, the court was confronted with the actions of a policeman who killed a motorcyclist during the course of a high speed chase.  In determining what substantive due process standard should be applied to the facts before it, the court noted the different circumstances and government interests attendant in high speed police chases as opposed to those attendant in the pretrial custody setting.  In light of this recognition, the court determined that the "intent to harm" standard was appropriate to determine whether the defendant's conduct rose to constitutional significance because, like prison officials facing a riot, police facing a rapidly evolving and potentially dangerous situation are required to make quick decisions without the benefit of time for deliberation.  The court noted that in non-emergency situations such as pre-trial detention where circumstances are not fast moving, the lower standard of "deliberate indifference" should be applied to determine whether a defendant's actions rise to a constitutionally shocking level.  *Id*. at 851.

The actions at issue in Plaintiff's complaint concern his placement and continued confinement in the LTSU and the actions of Defendants while he was confined therein.  No emergent circumstances are evident from the record.  Thus, the appropriate standard to determine whether defendants' actions "shock the conscience" and thereby offend constitutional guarantees, is whether defendants' actions and/or omissions can be characterized as "deliberately indifferent."

The record evidence demonstrates that Defendants' actions were so offensive as to "shock the conscience" for purposes of imposing liability under 42 U.S.C. § 1983.  Thus, Plaintiff has failed to demonstrate that he was exposed to arbitrary government action in violation of right to substantive due process.  Consequently, Defendants are entitled to summary judgment as to such claim.

### H. State Law Claims

Plaintiff includes in his Amended Complaint state law claims of violations of the Pennsylvania Constitution.  A federal court has "supplemental jurisdiction" over claims that are "part of the same case or controversy" as a claim over which the court has original jurisdiction.  28 U.S.C. § 1367(a).  Subsection 1367(c) authorizes a federal court to decline jurisdiction over state claims even though the court has federal jurisdiction when:

1.  the claim raises a novel or complex issue of State law;

2.  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

3.  the district court has dismissed all claims over which it has original jurisdiction; or

4.  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. §1367(c).

When "the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995).  This Report recommends the dismissal of the Plaintiff's Amended Complaint.  It follows that the Plaintiff's state law claims should be dismissed as considerations of judicial economy, convenience, and fairness

to the parties do not provide an affirmative justification for retaining jurisdiction. *Accord* Lovell Manufacturing v. Export-Import Bank of the U.S., 843 F.2d 725, 734 (3d Cir. 1988).

**III.**        **CONCLUSION**

For the reasons set forth above, it is respectfully recommended that Defendants' Motion for Summary Judgment (doc. no. 63) be granted.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections may constitute a waiver of that party's appellate rights.

Lisa Pupo Lenihan
U.S. Magistrate Judge

Dated: February 26, 2010

Gary Banks, CT-8731
SCI Graterford
Box 244
Route 29
Graterford, PA 19426-0246